JASPER S. SCUDDER v. The TRENTON DELAWARE FALLS COMPANY, WILLIAM PERSE, and ELAM T. BALDWIN.

The power of a court of equity to interpose by injunction in cases of waste, private nuisance, and great and irreparable injury to the inheritance, is well established.   It does not rest on modern or questionable decisions, but is ancient, uniform, and not now to be shaken.

The late cases have so construed this power as to embrace trespasses of a continuous or extraordinary character ; and have gone upon the ground, that the property to be protected was of peculiar value, for the injury or destruction of which a recompense in damages could not be made.

The complainant is in possession of a farm on the river Delaware.  The house stands on the bank, not far from the commencement of the declivity.  The bank, along which the water sweeps when the river is full, is a green bank ;

the upper part of which, through the whole extent of the farm, is covered with a grove of trees. The lower part, from the water's edge to the height of ordinary freshets, and to the roots of the trees, has been secured by covering it with stones; by means of which, in connexion with the trees, the bank is at present effectually secured. In constructing the raceway of the Trenton Delaware Falls company, to create their water power, as located, this green bank, part of which is immediately in front of the dwellinghouse, must be cut down, and the trees destroyed; which will greatly expose the property to the encroachments of the river. This will be a lasting injury to the inheritance : it forms a clear case of waste, over all which cases the court has an undoubted jurisdiction.

July, 1832.

Scudder
v.
Trenton Delaware Falls Co.

Considering this in the light of a trespass, it is not an ordinary case, where the damage is temporary, or of such a character as to admit of full compensation. The company seek to take entire possession of this part of the property ; appropriate it permanently to their own use, and place it beyond the power or control of the complainant. This would be a complete severance of this part of the estate from the residue, and destruction of it in the character in which he now enjoys it : this court has authority to interpose its arm to prevent such an act.

If the complainant has lain by and slept over his rights ; has seen the defendants making contracts, and expending large sums of money, in the prosecution of their works, and taken no steps to restrain them ; it is fatal to the application. It is a law of the court, and dictate of sound reason, that when a party desires extraordinary aid, he must be prompt in his application.

But when the complainant did not consent to give his land, made no agreement with the company, and commissioners were appointed, who made an appraisement, and the amount was tendered him, which he refused to accept, and gave notice to the company that unless they paid him what he was willing to receive for the property, he would contest the validity of their proceedings ; it was not necessary for him to do more until his rights were invaded.

In all cases where a corporation exceed the limits of the power given them, or abuse or misapply it, the court will interfere : but it will not give its aid, where the powers granted have been exercised in good faith ; or where they are discretionary, or where the right is doubtful.

Private property cannot be taken for *private* use. The legislature have no right to take the property of one man and give it to another, even upon just compensation made.

The right of the state to take private property for public use, making just compensation, is a right appertaining to sovereignty, which the state may freely exercise on all proper occasions, and which a jury has no power to control.

This right (of taking private property for public use) was originally founded on *state necessity.* In process of time the right has been more liberally construed ; the term *public use* has been substituted ; and what shall be considered as public use, is, under the decisions of our courts, an unsettled question. What shall be a *public use* or *benefit,* may depend, somewhat, on the situation and wants of the community for the time being.

July, 1832.
—————
Scudder
v.
Trenton Del-
aware Falls
Co.

This right is not limited to the actual use and occupation of the property by the state; for private property is taken, in many instances, where the state in its sovereign capacity does not and cannot occupy it. It is not limited to public political corporations; for the right of private corporations, to take private property, for a variety of purposes, such as canals and railroads, is not disputed at this day.

The legislature, in this state, is not omnipotent, as the British parliament. The provisions of the constitution are paramount to the power of the legislature; and whenever the legislature, in the exercise of its authority, transcends the limits clearly prescribed to it by the constitution, its acts are void; and it is the duty of the judiciary to declare them so.

The constitution provides "that the common law of England, as well as so much of the statute law as have heretofore been practiced in this state, shall remain in force until altered by the legislature, &c., and that the inestimable right of trial by jury, shall remain confirmed as a part of the law of this state without repeal for ever." These words of the constitution are fully satisfied, by preserving the trial by jury in all criminal cases, and all trials of right in suits at common law.

THIS bill is filed to procure an injunction, restraining the defendants from entering upon the property of the complainant, for the purpose of cutting and constructing a raceway to conduct water from the river Delaware to a point below the Trenton Falls; the right to cut and construct which raceway is claimed by the Trenton Delaware Falls company for themselves, and for the said William Perse and Elam T. Baldwin as their agents, in virtue of an act of the council and general assembly of this state, entitled, "An act to incorporate a company to create a water-power at the city of Trenton and its vicinity, and for other purposes," passed the 16th of February, 1831.

After setting forth the act, or such parts of it as were deemed material, the complainant proceeds to state, that the capital stock was subscribed, and thirteen managers appointed; that these managers, under color of the act, have caused a survey and report to be made and filed of the location of the wing-dam and raceway, according to which the route passes through and over the farm of the complainant, near to his dwelling-house, and so as to occasion serious and lasting injury to his interests. That the said company, without making any compensation or offer of compensation to the complainant, caused a survey and map to be made, of so much of the said land as was intended to be appropriated by them, and exhibited them to the chief justice of

July, 1832.

Scudder
v.
Trenton Del-
aware Falls
Co.

the state, who thereupon appointed three appraisers, who in September, 1831, proceeded to make an appraisement, of the value of the complainant's lands to be appropriated as aforesaid, and of the damages to be sustained by him in consequence thereof. That the appraisers proceeded to make the appraisement, and after having made it, the company tendered to the complainant the sum of four hundred and fifty dollars, as the amount of his damages, which he declined to receive ; the same being, as he alleges, utterly inadequate, as a compensation for the value of his land and damages. That afterwards the said company, by themselves and their agents, entered upon the land of the complainant, and proceeded to fell and destroy the timber and trees there growing. That upon being warned against any further proceeding, they desisted from committing further waste, but threaten that they will at their leisure enter again on the property, and proceed to excavate and form the raceway thereon ; which raceway, if formed, would be a great and irreparable injury to the inheritance, by destroying the timber and trees growing upon the bank of the river Delaware, which form a natural and sure protection for said bank against the effects of ice and freshets ; by intercepting his ready communication with the river ; by depriving him of a valuable portion of his farm, and by destroying his fishery.

The complainant then charges, that the said act, so far forth as any authority is given thereby to the defendants to enter upon and take the land and property of the complainant for the purposes aforesaid, without making and tendering an adequate compensation, and without the consent of the complainant, is unconstitutional and void ; the same not being taken to answer any state necessity, nor for the benefit of the community at large, nor for any public use whatsoever, but solely for the private gain and emolument of the said company.

The complainant then further charges, that the said act, so far forth as it assumes to vest the right, property and interest of the complainant in and to his lands, in the company, without a just compensation therefor, and without an opportunity of having the said compensation ascertained by a jury, is unconstitutional and void : and prays that the said act may be so declared by the

88

court, and that the defendants may be restrained from again entering upon the premises and committing waste thereon.

To this bill an answer was filed by the company under their corporate seal, and by William Perse and Elam T. Baldwin, the other two defendants, under their oath ; which, with some affidavits, were read and used at the hearing. They do not so materially vary the case made by the bill, as to render it necessary to spread out their contents. They are adverted to in the discussion of the case, and receive due attention, so far as they bear upon the points coming under consideration.

*W. Halsted*, for the complainant. The application is for an injunction against the Trenton Delaware Falls company, to prevent their injuring the complainant's property, and to test the constitutionality of their charter. We allege that the act is for private purposes, and designed to take private property for private use ; and that, upon an assessment by commissioners, appointed by a justice of the supreme court, without the intervention of a jury.

This company was incorporated to create a water power, for manufacturing purposes. It is strictly a private corporation, and entitled to none of the privileges of a public corporation : *Angel and Ames on Corp.* 22 ; 4 *Wheat. R.* 668 ; 9 *Cranch's R.* 52 ; 2 *Kent's C.* 222.

We admit that private property may be taken for public use, making just compensation : but in this case, the property is not taken for public use or state necessity, but for private purposes. Highways are necessary for public use ; turnpikes, railroads and canals are highways, upon which all persons may travel, paying the prescribed tolls. They are for public use : 2 *Bay's R.* 46, 54. But this water power is for the benefit of the stockholders alone. No one has a right to use it without the consent of the company. They may occupy it all themselves, or sell or let out the privilege of using it, at what price they please. By the act, the state have a right to subscribe, and become a party, or stockholder in the company ; but that does not alter the case: 9 *Wheat. R.* 907 ; 2 *Ang. and Ames,* 22, 8. It would still be a private corporation, and the property taken would be taken for private use. If the

object of this incorporation is for public use, what neighborhood improvement is not for public use ? The water power will be private property ; does it depend on the extent of it, whether it will be for public or private use ? It is said it will be sufficient for seventy mills : how many mills will make it for public use ? If seventy, why not a less number ; why not one ? The erection of one mill, in certain situations, is a great public benefit ; particularly in the first settlement of a country. But can the legislature authorize a company to take private property to erect a mill ? A blacksmith's shop is, in one sense, for public use. It is necessary to agriculture and other branches of industry. Inns and taverns are for public use expressly, and they are regulated by general laws ; yet the property of A. cannot be taken without his consent, and given to B. to erect a blacksmith's shop or tavern. If not, why can it be taken to erect a mill, or any number of mills ? The legislature might have authorized a company to purchase and hold property for manufacturing purposes, as was done in the charter of the society for establishing useful manufactures at Paterson : but in authorizing them to take private property, without the consent of the owner, for such purposes, they exceeded their constitutional powers, and the act is void.

It is contrary to the spirit, if not the letter, of the constitution of the United States ; which provides, that private property shall not be taken for public use, without just compensation : *a fortiori*, it cannot be taken for private use at all. It may be considered contrary to the constitution in another respect : it impairs the obligation of contracts. A. purchases land, with covenant of warranty. It is taken, without his consent, and is given to B. He might have remedy on his covenant, but is cut off by the act of the legislature : 6 *Cranch's R.* 177 ; 9 *Cranch,* 43, 292 ; 8 *Wheat. R.* 464, 481 ; 4 *Wheat.* —, (*Dartmouth College*) ; 7 *John. R.* 502 ; 2 *Gallis. R.* 139, 144.

But if the object of this charter can be considered for public use, in such sense as to authorize the taking of private property without the consent of the owner, it must be done on just compensation made ; and the amount of that compensation can only be ascertained by the intervention of a jury ; for which the act makes no provision. Our state constitution adopts the common law of Eng-

July, 1832.

Scudder
v.
Trenton Delaware Falls
Co.

land, and provides, "that the right of trial by jury shall remain confirmed as a part of the law of the land, without repeal, for ever." By the common law, the compensation to be made for private property taken for public use, could only be ascertained by a jury, on a writ of *ad quod damnum.*

In England, where the parliament is omnipotent, they have ever respected this great principle of the common law; and never attempted to take private property for public use, without the intervention of a jury: 2 *Bay's R.* 55, refers to stat. 29 *Geo. II.* (1755,) which requires a jury to assess damages for land taken for a public bridge. The statutes 5 *Geo. III. c.* 50, *s.* 14; 7 *Geo. III. c.* 42, *s.* 12; 10 *Geo. III. c.* 25, and 13 *Geo. III. c.* 78, *s.* 16, make the same provision in case of taking land for public highways; and 7 *Geo. III. c.* 51, in case of a canal. The British parliament have never undertaken to do what our legislature have done in this instance; they have always provided for the intervention of a jury. I refer to 8 *John. R.* 433; 2 *Peters' R.* 645, as to the mode of proceeding in England, in taking private property; and 2 *Peters' R.* 656–7–8, as to the constitutional powers of the legislature.

In England, private property is sacred: it cannot be taken but for public use, and on compensation made; and that compensation must be ascertained by a jury: 1 *Blac. C.* 138–9, *n.* 15; *Fitzherb. N. B.* 509, 516. The same principle has been recognized in this court, by the late chancellor, in the case of the *Society at Paterson* v. *The Morris Canal*, and has been sanctioned by judicial decisions of high authority in this country. In 2 *Bay's R.* 38, it was admitted by the counsel on both sides. In *Vanhorne's lessee* v. *Dorrance*, 2 *Dal. R.* 310, Paterson, J., said, there were only three ways in which the state could take lands: 1. By agreement of parties; 2. On assessment by commissioners mutually chosen; and, 3. by jury.

To take private property for the purposes, and in the manner, prescribed by this act, is contrary to the principles of our state institutions. See the constitutions of *Massachusetts, New-Hampshire, Vermont, Pennsylvania, Delaware, Maryland,* and *Kentucky.* Under monarchical governments, where all power resides in the crown or parliament, if the people claim a right,

July, 1832.

Scudder
v.
Trenton Del-
aware Falls
Co.

they must show it. But under our government, where the power resides in the people, it is the reverse. The constitution has set bounds to legislative authority. All power not delegated to them, is reserved to the people ; and if the government claims a right, they must show it : *Delolme Const. Eng.* 316 ; 6 *Dane's Ab.* 431 ; *Federalist, No.* 49, 84, 273, 464.

It is contrary to natural justice : 1 *Bay's R.* 98 ; *Opinion of Marshal, J.,* 6 *Cranch's R.* 135–6.

It is contrary to the law of nature and nations ; the civil law, and, I may add, the divine law : *Dig. Pand. Justin.* 170 ; *Grotius,* 1 *vol.* 120, *B.* 1, *c.* 3, *art.* 6, *s.* 4 ; *Ibid.* 467, *B.* 2, *c.* 14, *a.* 7, 8 ; 2 *vol.* 947, *B.* 3, *c.* 20, *a.* 3, *s.* 2, 3, and note to *B.* 1, *c.* 1, *s.* 6—all go on what Grotius calls the *eminent domain,* and the owner is to be indemnified out of the public funds. Puffendorf calls this eminent domain, the *sovereign transcendant propriety,* and says this propriety never takes place, but in extreme necessity and emergencies. In the divine law there is one case, 1 *Kings, c.* 21 ; the vineyard of Naboth. There private property could not be taken for private use by a sovereign prince. There is no instance of it under Turkish despotism : 2 *Bay's R.* 60 : The mufti told the sultan Mustapha, that the laws of the prophet forbade his taking private property ; and shall it be done in this christian country, and that without the intervention of a jury ?

The whole history of our legislation is based on this principle, that a jury is necessary : *Leam. and Spi.* 428 : it must be by judgment of peers, or according to the laws of England. This has been the uniform course in New-Jersey, from the adoption of the constitution until the Morris Canal company obtained their charter : that was the first innovation. The act incorporating the society at Paterson, passed in 1791, provided for a jury. The same provision is contained in the turnpike and railroad laws, from 1801, when the first turnpike act passed, to 1831, when the Paterson and Hudson river railroad, and the Elizabeth-Town and Somerville railroad acts passed.

The constitution contains no express provision for this particular case. The provision is general. It adopts the common law of England, of which the principles we contend for are a part ;

and guarantees the right of trial by jury, which it calls inestima-
ble.   If it is so between parties standing on equal grounds, it is
much more so where the weight and influence of the state, a cor-
poration, or an interested community, is thrown into the scale,
against a solitary individual.

*G. D. Wall*, for the defendants.   The bill in this case is of
extraordinary character.   It is not to restrain the company, but to
call in question the constitutionality of their charter.   It does not
allege that the defendants have exceeded their authority, or pro-
ceeded without the bounds of their charter : but insists, that
they have no constitutional right to proceed at all.   If the law is
constitutional, the complainant has no ground to stand on ; and
if the object be to test the constitutionality of the charter, the
complainant should have resorted to another tribunal.   But he
avoids the legal tribunal, in which it should properly be tried,
and seeks to call it in question in this court.   A court of equity
is ancillary to a court of law, and does not take original jurisdic-
tion of a question of this kind : 19 *Ves.* 449 ; 1 *Coop.* 305.—
There are cases in which a court of equity may try the constitu-
tional question incidentally ; but not one in which it is made the
great preliminary question.   This court has no power to try the
constitutionality of the act, or question the power of the com-
missioners, *per directum :* 4 *Wash. R.* 608.

To entitle him to an injunction, the complainant should not
only present a proper case, but be prompt in his application.   He
has lain by, and is now too late.   The company made the sur-
vey and map, gave notice and applied for the appointment of
commissioners.   They went upon the ground, made the assess-
ment, and the amount was tendered him.   He did not appear
before the chief justice, or make any objection to the appoint-
ment of the commissioners.   He made no objection to their going
upon the ground, but accompanied them there, and explained to
them the nature and extent of the injury he would sustain.   He
might have brought up the question by certiorari, trespass, or
ejectment, but he made no application to the court for aid in any
way.   He has remained a passive spectator of the operations of
the company, until they have expended a large sum of money,

and advanced with their works too far to recede ; and now comes into court for an injunction to arrest their farther progress. We insist he is too late.

July, 1832.

Scudder
v.
Trenton Del-
aware Falls
Co.

The bill is founded upon the principle, that irreparable injury was about to be sustained. The object to be protected is the farm; the injury to be sustained is the destruction of the river bank, and trees growing on it, which form a protection against freshets and ice; and the destruction of a fishery. The facts are controverted, or denied, by the answer, which is competent : 4 *Wash. R.* 605, *Haight* v. *The Morris Aqueduct Co.* But we have affidavits, which disclose the facts. The complainant loses about one acre of land, of little value. It is a bed of gravel, on the shore, below the present bank of the river, incapable of being used for agricultural purposes. It is unenclosed, and separated from the farm by a public road on the top of the bank, which passes between that and the other lands of the complainant. On the bank stand a few forest trees, of no use for ornament or shade; but which, it is said, form a protection to the bank. This bank will be shaved down, and another formed, between the raceway and the river, which will afford a protection ; and the one bank will be substituted for the other. But the complainant says he has a right of fishery. He owns the land fronting on the river only part of the way. They set out on his land, and draw in on the land of another person. He really owns no fishery: it has not been entered according to law. The court cannot protect a fishery that has no legal existence. If it had, the land line can be carried as well on the bank of the raceway as on the river bank; and the fishery will not be injured. There is no injury to be apprehended from the encroachments of the river. The bank to be erected will be a better protection to the farm than the river bank. The only cause of complaint is, that a few trees may be cut down, which are now liable to be cut by the overseer of the highway.

This is not a case of irreparable injury. The complainant must show that the injury is irreparable, and that no adequate relief can be had at law, to give this court jurisdiction : *Opin.* of this court in the case of *The Columbia Water Co. ; 7 John. C. R.* 307. Here the injury, if any, is trifling, and may be

compensated in damages : there is no ground for injunction. Beside, the complainant sets up his title to the land : the defendants say they have acquired title, by proceedings under the act. The title is in dispute. This court will not interfere in such a case, and go beyond the precedents and principles of the court ; but will leave the parties to their legal rights.

As to the constitutional objection, that the taking of this property is for private purposes, and not for public use ; that it does not appertain to that *eminent domain* which is the right of sovereignty : we say, that under our constitution that right is vested in the people, or their representatives in the legislature. What is the limit to that power, it is not easy to say, when it is not ascertained by the social compact. To the legislature also belongs the power of determining when it is proper to exercise this right ; or what is a public use, for which private property may be taken. The one is incident to the other ; and when the legislature have decided, their judgment ought not lightly to be called in question.

The company are authorized to create a water-power, for manufacturing purposes. The great object of the law, is to advance the cause of manufactures. And have not the legislature a right to do this ? In what other way can they turn to public account and benefit the waters of the state, and privileges appertaining to them, but by acts of incorporation ? Manufactures increase agriculture and commerce ; and are not these public concerns ? Highways are under the power of the legislature on the same principle. It is for the wisdom of the people, in their aggregate capacity, to judge of the public necessity, from the object and expediency of the measure ; and the opinion of the legislature must govern : *Opin. Ch. Walworth, Beekman* v. *Saratoga and Schenectady Railroad Co.,* cites 2 *Kent's C.* 256. See also 2 *Peters' R.* 251.

Again, the raceway will be a navigable canal. The water is taken from the Delaware, and carried round the principal obstructions to the navigation of the river ; Scudder's, White's, and the Trenton falls. It is not necessary that it should be declared to be a public highway in the act ; it must necessarily be so. The water is taken from the river into the canal, and passes out ;

it is public property, and is impressed with the right of servitude to the public : *Harg. L. Tracts*, 9 ; *Hale's de Jure Maris.*

The charter does not conflict with the constitution of the United States : compensation is to be made, but this need not be assessed by a jury. The legislature may adopt any other mode. The assessment by a jury, on an *ad quod damnum*, was the general mode in England, but not universal : 1 *Jacob's L. Dict.* 49. There are many cases under the enclosure acts, in which that mode was not resorted to. Other modes were adopted in this state, under the proprietary government : *Leam. and Spi.* 440 ; also under the royal government : *Allison's N. J. L.* 273, *sec.* 3, provides for the assessment of damages, for making roads, by commissioners. It is true, the first turnpike acts provided for the assessment of damages by jury ; but that was unnecessary. Damages may as well be assessed by commissioners : it is done in other states, where the common law is adopted.

This does not interfere with the trial by jury. The true construction of the constitution of New-Jersey, is, that the trial by jury is to remain in criminal cases, and the trial of issues in fact between party and party : *Opin. of Baldwin, J., Buonaparte* v. *The Camden and Amboy Railroad Co.* This construction is reasonable ; it satisfies the words of the constitution, and is conformable to the practice heretofore existing in this state. We insist that there is nothing in these constitutional objections.

*S. L. Southard,* on the same side. After the argument that has been made in this case, little remains to be said. My object will be, to satisfy the court, that this case is within the principles laid down by chancellor Walworth and judge Baldwin, the opinions cited ; and to show, that the facts in this case present no equitable ground to give this court jurisdiction.

Who are the parties, and what are their rights ? The complainant owns a farm on the Delaware : his right of soil runs under the water, and he claims a fishery. The defendants are a corporation, intended to effect a great public object ; calculated to promote the agriculture and commerce of the country, and to

89

operate upon the navigation of the river.  It is not extravagant
to say, that it is calculated to have a larger effect upon the man-
ufacturing interests of the country, than any other institution in
this or any other of the states.  There is not another location
which, from the natural advantages of its situation, between the
two great emporiums, and the extent of its water-power, is cal-
culated to produce such effects.  It is subject, by the terms of
the charter, to be taken for the benefit of the state, and subject
to a right of subscription on the part of the state.  It seems to
be insisted, however, that because the legislature did not declare
it was intended for a public benefit, it is not so.  This does
not follow.  If there be a plain object of public utility, then it is
necessary, and beneficial to the state.  Every provision of the act
shows that the legislature had the public good in view.  I infer,
from the general character of the act, its provisions, and the ef-
fects to be produced, that this is an act for the public benefit.  It
is within the principle laid down by chancellor Walworth.

The whole object of the bill, is to show, that the law is uncon-
stitutional, and on that ground to arrest the proceedings of the
company.  The complainant ought to have commenced his op-
position when his land was first touched.  He then made no
opposition.  The survey was made, the surveyors made report,
it was made public, and yet no complaint was made.  They ap-
plied to know if he would give or sell the land.  He did not then
say the law was unconstitutional, but said he must have one
thousand dollars; and this for about one acre of land, on the
bank of the river.  Commissioners were applied for: he made no
opposition at that time.  When they went upon the ground, he
appeared before them.  He prepared a paper, and stated in wri-
ting to the commissioners, the grounds of his damages, and the
amount he ought to have awarded to him.  Did he not, in equi-
ty, assent to the proceeding?  5 *Wend. R.* 581–5 ; 4 *Halst. R.*
21, 22.

He laid by when he ought not: the consequence is important
to the defendants.  Unless the raceway goes on his land, it can
go nowhere.  He stands by, and sees the company making con-
tracts to the amount of thirty thousand dollars, and expending
the money ; and after the work has progressed to a great extent,

he comes to a court of equity for aid. I think I should not be out of the way in saying, that the conduct of the complainant has admitted the constitutionality of the law; and that he cannot be permitted now to come into court and deny it. These circumstances should prevent the court from listening to the application.

July, 1832.

Scudder
v.
Trenton Delaware Falls
Co.

The company are acting under an act of the legislature : there is no charge that they have gone out of the act. The granting of injunctions is discretionary ; and the court will not interfere in such a case. The complainant claims title to the land ; the defendants claim a right to take it, under the statute. It is a question of title, purely a legal question, which belongs to courts of common law jurisdiction. The complainant has ample remedy at law, and ought not to come into a court of equity. The injury is not irreparable. The term, irreparable mischief, is well understood in equity. This is not of that character. If the bank is injured, that can be repaired ; and the injury, if any, to the fishery, compensated in damages. But we insist that neither will be injured. The bank of the raceway will serve for the fishery, and protect bank of the river. The very existence of the company depends on their maintaining the bank of the raceway. But has the complainant a fishery ? It consists of going into the water on his land, and coming out upon the land of another. It has not been entered according to law. He has no fishery. There must be a distinct substantive property, to which the party has lawful right, to entitle it to protection.

But it is said the law is unconstitutional, on two grounds :— 1. That it takes private property, for private purposes ; and, 2. That it tries questions of fact, without jury. As to this, I say, 1. That the constitutionality of a law is not for equity, but for common law cognizance : 2. That the unconstitutionality of a law, of itself, has never been the ground of an injunction.

I do not mean to say, that the court cannot decide the law to be unconstitutional ; but that the party cannot come into court on that ground alone. He must show such a case, as, without the law, would be a proper case for injunction : then, if the defendants set up the law, it may be decided unconstitutional. But let us look at these questions, first, as to the ground, that the property of one man cannot be taken and given to another. I

do not mean to say that this is not correct. This was the case in *Vanhorne's lessee* v. *Dorrance*, in 2 *Dal.* —. There the land of some individual was to be taken and given to others : the public interest was not to be benefitted. But the learned judge who decided that case, never said that such was the rule where public interests were concerned.

The rule laid down by judge Story, is, that all but political corporations are private : 4 *Wheat.* 668. Some private corporations must, then, be of a public nature ; otherwise it might be said, that private property could not be taken for a private corporation : but this is not so. Private property may be taken for a private corporation, when the object is for public use. When a corporation is calculated, or intended, to produce public benefit, then it is public in its nature, and for public use. This is the principle on which chancellor Walworth puts himself. And who is to judge what is such a public use, as will justify the taking of private property ? Who represents the sovereign power of the state, in whom this right of eminent domain resides ? The legislature are to judge ; and when they have adjudged, this court, nor no other, has the power to control it.

I admit that just compensation must be made, but *quo modo*. It is left open by the constitution. The legislature, not the court, are to point out the mode. There is no restriction. We are told that the legislature cannot point out the mode ; there must be a trial by jury. The right of trial by jury is secured by the constitution, and I do not mean to advocate any infringement of it ; but deny that it extends to this case. The constitution says, the right of trial by jury shall be confirmed, for ever. How did it exist when the constitution was adopted ? It was in use only in criminal matters, and where parties disputed about facts. I deny that it existed as a mode of assessing damages, where there was no dispute about facts. In certain proceedings in the orphan's court, and in this court, in cases that did not exist previous to the adoption of the constitution, there is no trial by jury. But we are told, that the common law of England, at the time, required an assessment by jury, on a writ of *ad quod damnum*. But there were various cases in which this mode was not resorted to in England. It is amusing to trace the history of the writ of

ad quod damnum in this country. Some states use it altogether; some have never heard of it : 2 *Virginia Rev. L.* 225, 233, 238. Had this writ been adopted and in use in this state at the time the constitution was formed ? I know of no allusion to it, but in the charter of the society at Paterson, and one other case. *Smith's History of New-Jersey*, 129, informs us, that the first legislature held in New-Jersey, authorized private property to be taken for roads, by paying damages, to be assessed by commissioners. Will it be said that this relates to public highways? So do the cases in England. That shows that the rule was not universal, and hence the discretion of the legislature. These facts support the opinion of judge Baldwin, in the case referred to; to which I recall the attention of the court.

But I think there is a provision of the act incorporating this company, which has a bearing on this question. By the fifteenth section, the right of a trial by jury for damages, is reserved to the landholders. The damages must be assessed by appraisers, to enable the company to go upon the ground; but the right of trial by jury is not taken away; the remedy is left open to all who will not accept the sum awarded them. How, then, is the constitution violated ? and what ground has the complainant to come here for injunction? I insist that he has no ground to claim it at the hands of the court.

*I. H. Williamson*, in reply. The complainant owns a valuable farm on the river : the defendants seek to take a part of it for their raceway. In constructing that, they will destroy the bank, which forms a natural protection to the farm against the river, and destroy a fishery. This is not a mere case of trespass, that may be compensated in damages, but a clear case of waste. Every serious injury to the inheritance, is waste : 2 *Blac. C.* 280. It is no answer to say, that the property is of little value, or the damage trifling. It is the peculiar nature and situation of the property, that entitles it to protection. The bank of the river, here, is a green bank, covered by a grove of trees in front of the house, and extending part of the way down the declivity. They support the bank, which protects the farm against the encroachments of the river. It is said they are forest trees : but forest

trees will be protected in equity, if useful only for shade or orna-
ment. That they are necessary to preserve the bank, I refer to
the affidavits. Let them be cut down and the bank destroyed,
and the injury is irreparable. The case in 7 *John. R.* was a
mere trespass, in a quarry of stone of no special value that could
not be compensated in damages.

It is said the waste is denied by the answer: that is under the
common seal, and not under oath; it is insufficient. The an-
swer denying the equity of a bill, must be as positive as the bill
itself. The opinion of judge Washington, which has been cited,
is entitled to great respect, but cannot be supported. The con-
trary has been decided, in New-York and in this state.

The fishery is valuable: it has been used as a fishery for the
last ten years. It is of no importance that it has not been enter-
ed: it exists, and may be entered at any time. And if we own
but a part, we are entitled to protection in that part. We are told
we have remedy at law for the injury we may sustain, by tres-
pass, ejectment, or certiorari. The remedy at law is inadequate.
We seek to prevent the injury: we could not go to law for that.
The courts have concurrent jurisdiction in some cases, but this
court alone has the power of prevention. If we had went to law,
the company would have gone on to destroy our property, and
we must have come here for a preventive remedy.

But, it is said, our application is too late; that we have acqui-
esced in the proceedings of the company. Not so: the com-
plainant, when applied to, stated the amount he demanded; and
always expressed his determination to contest their proceedings,
unless they made him full compensation; and the moment they
cut down the first tree, he filed his bill. He could not, with safe-
ty, have filed it before: 1 *Swanst. R.* 243, 250.

I now approach a question of deep interest, the constitutionality
of the charter. We object to this exercise of legislative authority,
because it gives power to divest a freehold, and give it to a private
company, for private purposes. All corporations, except political
or municipal, are private corporations; although the objects of
some are for public use. In this class come all corporations for
the erection of turnpikes, railroads, and canals. They are high-
ways. Every one has a right to use them, and if prevented may

bring his action : hence they are for public use. But this act was passed on individual application. It is a private corporation. They are authorized to create a water power, and may let or sell water privileges to individuals, to be employed by them for their own benefit. The property taken, will be private property still, and for private use. It is not for state necessity, or public use ; for which purpose only can private property be taken. Hence the defendants' counsel are driven to the argument, that this is a project of great public utility, calculated to promote manufactures, increase agriculture, extend commerce, and benefit the community ; and that this is such a public use as will justify the taking of private property. But will the public have a right to use this water power ? Not unless they purchase it of the company. That there is a resulting benefit to the community, avails nothing. This is the case with most private corporations ; they are calculated, in some respect, to benefit the community. The bank of the United States, although the government was a stockholder, was a private corporation, and for private use ; but supposed to be beneficial to the community, and useful, if not necessary, to the government. All banks are considered beneficial to the community ; they promote agriculture, manufactures and commerce. What would this water power avail the public, without the aid of bank facilities ? Yet private property cannot be taken to erect a banking house. So every church, college, hospital, or even a block of houses, erected in a populous neighborhood, is a benefit to the community. But this is not the *public use* contemplated in the constitution. Private property could not be taken for such purposes.

It is said, this raceway will be a navigable canal, for public use ; but the public will have no right to use it, unless they purchase the right of the company. Nor can it be used to assist the navigation. They must come out where they go in ; there is no provision for a lock to let them out at any other point ; no authority to take tolls ; no regulation for passing boats or right to pass, secured to the public. The manifest object is, not to make a navigable canal, but create a water power, for manufacturing purposes, and for private use. There must be a *public necessity*, a *state necessity ;* and it must be for a *public use,*

July, 1832.

Scudder
v.
Trenton Delaware Falls Co.

in which all the community may, of right, participate, to authorize the taking of private property.

This is the first attempt, in this state, to take private property for private use. It is a precedent of dangerous tendency, and ought to be resisted. If a company of individuals, or a corporation, want property for such a purpose, let them purchase it. Look at the charter of the society at Paterson. When that act passed, manufactures were in their infancy. It was a great object to introduce them. The general government took great pains to promote it: the state took a deep interest in it. That company had power to establish manufactures, and build navigable canals, designed for the transportation of goods and passengers. They are authorized to take private property for the use of their canals, because they were designed for public use; but not to create their water power, or for the use of their manufactories; which, though beneficial to the public, were for the private use of the corporation. That act was drawn by Alexander Hamilton. It was one of the first charters granted in this state after the adoption of the constitution, and may be regarded, in some measure, as a cotemporaneous exposition of that instrument.

The British parliament possess no power to take private property for private use. I refer to the celebrated case of the *Isle of Man*, noticed by the court in 2 *Dal. R.* 314; and is property not as safe here as in Great Britain, under a limited monarchy, with no written constitution to restrain the power of parliament?

What is a constitution? It is the supreme law of the land, paramount to the power of the legislature. It limits the exercise of legislative authority, and prescribes the orbit in which it must move: 2 *Dal. R.* 308. The legislature are the agents of the people; their power is delegated; they possess none but what is given them by the constitution, expressly, or by necessary implication. What is not given, is reserved to the people. Story, J., (speaking in reference to Rhode Island, where they have no written constitution,) says, It may well be doubted, whether the nature of society and of government, does not present some limits to legislative authority: 6 *Cranch's R.* 135; 2 *Peters' R.* 657. This position is correct. The right of acquiring and possessing property, is one of the natural, inherent and inalienable rights

of man : 2 *Dal. R.* 310 ; 2 *Blac. C.* 8, *n.* 1 ; 4 *Blac. C.* 9, *n.* 4. Its protection is one of the great objects of civil government : 1 *Blac. C.* 138–9.

July, 1832.

Scudder
v.
Trenton Delaware Falls Co.

I rely upon the distinction, that although private property may be taken, when it is necessary for public use ; it cannot be taken for private use, although it may ultimately benefit the public. The only case to the contrary, is the opinion of chancellor Walworth. He goes so far as to put private property under the power of the legislature, in the case of state expediency. He cites 2 *Kent's C.* 274–5. This authority does not support his position. It cannot be law ; or we live under a despotism, and hold our property at the will of the legislature. To this I oppose the opinions of Paterson, Marshall, and Cranch. I repeat it, there must be a *state necessity ;* it must be taken for a *state use.*

Although the legislature must decide, in the first instance, they are not the exclusive judges of the necessity, or use, for which private property may be taken : it belongs also to the judiciary ; and this court has the same right as a court of law, to decide upon the constitutionality of an act of the legislature. If this court has jurisdiction of a cause, on equitable grounds, it tries all matters connected with it. It is not bound to try a question of law, and may send it to a court of law to be tried ; but it has the power to decide it without.

But if the legislature had power to authorize the taking of private property, in this case, we object to the mode. The constitution says, " Private property may be taken for public use, making just compensation." How is that compensation to be ascertained ? By known and established principles, according to the law of the land : 1 *Blac. C.* 138. By this is meant, the right of applying to a court, and having a trial by jury. In *Vanhorne's lessee* v. *Dorrance,* Paterson, J., says, There are only three ways in which the amount of compensation for land taken by the state, can be ascertained : by agreement—by commissioners mutually chosen—or by a jury. He says, a jury is a necessary check on legislative authority. His argument is conclusive. But this act authorizes it to be done, not according to any known rules of law, but in a summary and arbitrary manner. Commissioners, appointed without the consent of the party, proceed,

90

without the examination of witnesses, without jury, verdict, or judgment : they make report, not to any court, but to the secretary of state ; and from this there is no appeal.   Such a tribunal is incompatible with the principles of our free institutions.   Private property is sacred : the constitution was intended to make it more so.   That guarantees the common law right of trial by jury.   If the legislature cannot abolish the trial by jury, which is not pretended, can they dispense with it in any case ?   The chancellor of New-York seems to think it may be done.   Of what avail then is our constitution.   We insist, that no man can be divested of his freehold without his consent, or the intervention of a jury.   Judge Baldwin says, that to require a jury, there must be a disputed fact in issue.   That cannot be the test ; for when a defendant, in an action sounding in damages, suffers judgment by default ; whereby the facts are admitted, and no question remains but the quantum of damages, there must be a jury.   This is the case in every instance where the writ of *ad quod damnum* is used.   Nothing remains to be ascertained but the quantum of damages.   But, it is said, that in this state, there are precedents for taking private property without a jury, before the revolution.   The cases referred to are inapplicable, and do not support the position. The ordinance mentioned in *Smith's History of New-Jersey*, was under the government of the proprietors, who owned the soil and held the sovereign power, under no restriction but what they themselves imposed.   The act contained in *Allison*, appointed commissioners to make a survey and estimate, and report the practicability and probable expense, of making a road.   But in neither case was power given to take land ; and both were before the constitution was fully established as part of the law of this state, and the right of trial by jury became the unquestionable right of every citizen of New-Jersey.   The framers of the constitution did not adopt the laws, usages or innovations of the proprietors : they adopted the common law of England, and with it the trial by jury ; and from the manner in which they allude to it, and their manifest solicitude to render it perpetual, it is to be inferred that they meant to adopt it in its full extent, and for every purpose to which it was applied in England.

I therefore conclude, that in New-Jersey private property can

only be taken for state necessity or state use; not for private use under the idea that the state may be benefitted; and that it cannot be taken, for any purpose, without the intervention of a jury.

July, 1832.

Scudder
v.
Trenton Delaware Falls
Co.

THE CHANCELLOR.   It is always important for a court to ascertain, before it passes upon a cause submitted to it, that its nature and character are such as to be within the power and jurisdiction of the court; and especially when the jurisdiction is questioned or denied by the party upon whom the decision is to operate.   It is peculiarly important for a court of equity, whose powers are extraordinary and peculiar, and which administers relief in a mode unknown to the common law.

My first business will be, to inquire whether the court can take jurisdiction of the cause now before it.

The power of a court of equity to interpose by injunction in cases of waste, private nuisance, and great and irreparable injury to the inheritance, is as well established as any that the court now exercises.   It does not rest on modern or questionable decisions, but is ancient, uniform, and not now to be shaken. The late cases have so construed this power as to embrace trespasses of a continuous or extraordinary character: *Eden on Inj.* 139; *Stevens* v. *Beekman*, 1 *John. C. R.* 318: and they have gone upon the ground that the property to be protected was of peculiar value, for the injury or destruction of which a recompense in damages could not be made.

Upon the showing of the complainant, this is a clear case of waste.   The complainant is in possession of a farm on the river Delaware.   The house, which he has recently erected, stands upon the bank, not far from the commencement of the declivity.   The bank along which the water sweeps when the river is full, is now a green bank, the upper part of which, through the whole extent of the farm, is covered with a grove of trees.   The lower part, from the water's edge to the height of ordinary freshets, and to the roots of the trees, has been secured at great expense, by covering it with stones, by means of which, in connection with the trees, the bank is at present effectually secured.   In constructing the raceway as at present located, this green bank, a part of which is immediately in front

of the dwelling-house, must be cut down, and the trees destroy-ed, which will greatly expose the property to the encroachments of the river.

The answer, it is true, denies that the route of the raceway runs through the property in such a way as to occasion great, serious and lasting injury to the interests of the complainant in his said farm. It alleges, that the ground to be occupied will not exceed one acre, no part of which is enclosed or has ever been used for the purpose of cultivation, and that it will not be necessary to remove any trees or timber there standing, except a few forest trees, and those of little value.

I do not deem it necessary to inquire how far the court is bound to respect this answer, put in by the company under their corpo-rate seal, or to sit in judgment on the opinion of judge Washing-ton on this subject, in the case of *Haight* and the *Morris Aque-duct Co.* in 4 *Wash. C. C.* 601, the legality of which was de-nied at the bar; for admitting the answer to be true, the case made by the bill, answer, and affidavits, is sufficient, in my view, to make out the apprehended case of waste. The facts admitted by the defendants, that a part of the bank must be taken down, and a part of the trees removed, are of more weight than the conclusions which they undertake to draw from them, that the injury resulting will be neither serious nor lasting. It is clearly shown that the bank as it now is, with the trees upon it, form a very valuable protection to the property. The importance of the trees is demonstrated by a fact stated by one of the wit-nesses—that within his recollection, the trees upon the bank of the river about a mile below the complainant's, were cut down, and although great labor had been expended and great expense incurred in securing the bank, yet that the river has very rapid-ly encroached upon it. He further states, that the spot spoken of is, as he thinks, less likely to be injured by the river than the farm of complainant; the channel of the river near the former place being free from islands and all other obstructions to its natural course. If the apprehended or threatened act of the company will be a lasting injury to the inheritance of the com-plainant, (of which there is no room, as I think, to doubt,) it forms a case of waste, over all which cases the court has an un-

doubted jurisdiction, and will exercise its preventive power on all proper occasions.

But if this should be considered in the light of a trespass, I should feel no difficulty in entertaining jurisdiction. It is not an ordinary case, where the damage is temporary, or of such a character as to admit of full compensation in damages. The defendants intend not merely to enter and carry away the product of the soil, or even a part of the soil itself, which the complainant might afterwards replace; they seek to appropriate the land to their own use, permanently and absolutely; to take entire possession of this part of his property, and place it beyond his power or control, as though he had never owned or possessed it. This would be a complete severance of that part of the estate from the residue, and a destruction of it in the character in which the complainant now enjoys it; and it would be strange if this court had not authority to interpose its arm for the prevention of such an act. In *Jerome* v. *Ross*, 7 *John. C. R.* 331, the court refused to interfere in a case where the trespass charged was for entering upon the land of the plaintiff, and digging and taking away large parcels of stone from a ledge of rock on the premises. It was not charged, nor did it appear, that the ledge of rock was of any particular use or value to the plaintiff, or that it was desirable for building, fencing, or any other purpose either for use or ornament; and the court was of opinion that the plaintiff's remedy was in a court of law for damages. The distinction between that case and the present one is very strongly marked; and taking it on the ground upon which it was placed by the chancellor, it is an authority in favor of the complainant. From the reasoning of the court, and the cases cited, there is no doubt, that if the trespass complained of had been destructive of the estate, he would have injoined the defendant; and this doctrine is supported by a great variety of cases, in England and this country. See 7 *Ves.* 305, *Hanson* v. *Gardiner ;* 1 *Bro. C. C.* 588, *Robinson* v. *Ld. Byron ;* 3 *P. Wms.* 255, *Gibbs* v. *Cole ;* 15 *Ves.* 138, *Crockford* v. *Alexander ;* 2 *Dow P. C.* 520 ; 1 *John. C. R.* 318, *Stevens* v. *Beekman ;* 2 *John, C. R.* 463, *Belknap* v. *Belknap ;* 9 *Wheat.* 840, *Osborne* v. *Bank of the U. S.*

Without pursuing this subject further, I shall consider that the court has full and complete jurisdiction in this case.

It is insisted, however, by the defendants in this cause, that if the court has jurisdiction, it ought not to be exercised at this time in favor of the complainant. It is said he has lain by and slept on his rights ; has seen the defendants making contracts for, and expending large sums of money in, the preparation of their work, and taken no step to prevent or restrain them, until the present bill was filed. If this objection be well founded, it is fatal to the application. It is a law of the court, and a dictate of sound reason, that when a party desires extraordinary aid, he must be prompt in his application.

The facts in this case show that the complainant did not consent to give his land for the purposes of the company, and that no agreement was made with him fixing the amount of compensation he was to receive. Upon this is founded the application to the chief justice for the appointment of commissioners to make an appraisement of the value of the land, and the damages the complainant was entitled to receive. After the valuation was made, and when the amount of it was tendered, he refused to accept it as a just compensation ; and gave notice, that unless the company paid to him what he was willing to receive for the property, he would contest the validity of their proceedings. His courtesy to the commissioners, in permitting them to walk on and view the ground, cannot deprive him of his rights ; nor does the fact, that he went with them over the ground and explained to them the nature and extent of the injury he was about to sustain, vary the case materially. He did not appear before the commissioners when they met to make up their report, either in person or by attorney. He fixed his price for his property. If the commissioners had thought proper to award him that amount, or if the company had thought proper to pay it to him, he would have waived all objections to their power, and to the mode of proceeding. He had a perfect right to do so. The company could not have been deceived, for they knew the determination he had made. They might have hoped, and probably did hope, that the complainant would be induced to alter his mind, and accept the sum awarded. However this may be, if they went

on under such circumstances they proceeded at their peril. It will not avail them to say, that the complainant saw them commencing operations, and expending large sums of money, knowing that the raceway must necessarily be constructed through his land, and yet that he took no means to prevent it; that he sued out no certiorari, and filed no bill; and that, having neglected to take any legal measure, he is now too late, and must lose the privilege of the preventive remedy of the court. I do not perceive in this any laches deserving so severe a visitation. The complainant, it is true, might have filed his bill at an earlier day, placing himself upon the ground, that, as the survey was filed and could not be departed from, the danger was impending and the injury might be committed at any moment. The risk of sustaining the bill at that time would have been upon him, and he might have taken it if he had chosen to do so. But it must be remembered that the company had it in their power to bring this difficulty to an issue before they had expended any thing more than was necessary to make their surveys. They could have gone upon the property, as they afterwards did, and commenced operations. If the complainant had then remained silent, and acquiesced in the act; if he had seen them cut down the trees and make half the excavation, and had then applied for an injunction to prevent its completion; or if he had permitted the raceway to be completed, and then sought to enjoin them from letting in the water, he would have been too late. This court would have turned him over to his legal remedy for redress. But under the circumstances, was it at all necessary that the complainant should do more than he did? He had refused to accept of the sum awarded, and made known his determination to stand upon his rights, unless the company paid to him the amount that he deemed a proper compensation. It was not necessary for him to do more, until his rights were invaded. Justice to the company did not require it; and if from his not acting sooner, the company drew the conclusion that he did not intend to act at all; might not he, from the fact that the company was constantly expending large sums of money with full knowledge that this difficulty remained open, with much more propriety have drawn

July, 1832.

Scudder
v.
Trenton Delaware Falls
Co.

the conclusion, that they intended to pay him his price for his property?

It is not unlikely that there have been misapprehensions on both sides, and that both parties have entertained the hope that the difference would be in some way adjusted and litigation prevented, and that in this they have both been disappointed. It is not perceived, however, that their legal rights are in any wise varied by it; and under the clear impression that the application of the complainant is not too late, I shall now proceed to consider the remaining and more important questions in this cause.

It appears from the case made, that the proceedings of the defendants are sought to be justified under the act of incorporation already mentioned, giving them authority to create a water power. This act, as we have seen, provides the mode to be pursued by the company in surveying, appropriating and acquiring title to such lands and property as may be necessary for the purposes of their grant. It requires a survey; an agreement between the parties, or, in case of disagreement, an assessment by three indifferent men; and a payment or tender of the amount appraised.

There is no complaint in this case that the company have exceeded the limits of the power given them, or that they have abused or misapplied it. In all such instances of abuse or misconduct, the court will interfere; but it will not give its aid where the powers granted have been exercised in good faith, or where they are discretionary, or where the right is doubtful: *Coop. Eq.* 77; 7 *John. C. R.* 340, *Jerome* v. *Ross*; 2 *Dow*, 251. The complaint is of a more serious character, deeply affecting the claims of the defendants, and the rights of the community. It is, that the act of incorporation, though emanating from the legislative authority of the state, confers no power to take the complainant's property in the way, and for the uses, in which it is designed or attempted to be taken; that it is unconstitutional, and therefore void.

Two grounds are taken:

One is, that the act assumes to vest the complainant's right and property in his lands, or a part of them, in the defendants, without a just compensation therefor, and without an opportunity

of having the compensation ascertained by a jury of the country.

Another is, that the land is sought to be taken, not to answer any state necessity, nor for the benefit of the community at large, nor for any public use whatever, but solely for the private gain and emolument of the said company.

The first ground presents the question, whether in cases of this kind, private property can be taken, without the intervention of a jury to ascertain the compensation which the party is to receive as an equivalent. The fifth amendment of the constitution of the United States declares, that private property shall not be taken for public use, without just compensation ; but it is silent as to the mode of fixing the compensation, when there is no agreement. The twenty-second section of the constitution of our state, provides that the common and statute law of England, so far as they have been adopted, shall continue in force in this state till altered by the legislature, and that the inestimable right of trial by jury shall be and continue without repeal for ever.

In this branch of the argument, I assume the principle, that the property to be taken is for public use ; that it may, under the constitution of the United States, be divested on making just compensation. The right of the state to take private property for public use, is conceded as a general proposition. It is a right appertaining to sovereignty; one which the state may freely exercise on all proper occasions, and which a jury has no power to control. It cannot be pretended, therefore, that before a state may exercise this high attribute of sovereign power, a jury must pass on the legality or propriety of the act. This would be to place the necessities of the state, in some instances, and its privileges, in others, in the keeping of a jury of the country, which would be contrary to the established order of all governments. The right, then, cannot be made the subject matter of trial by jury. But *compensation* is to be made, and that, too, a just compensation ; and the question is, whether that just compensation can be ascertained in any other mode than by jury. No difficulty could arise on this subject, but for the constitutional provision. There is no reason why three indifferent men, selected by the chief justice from the body of the state, for their probity and indepen-

July, 1832.

Scudder
v.
Trenton Del.
aware Falls
Co.

dence, should not, in a mere matter of valuation, exercise as just a judgment, and be in all things as discreet and impartial, as a jury of the vicinage.

Does a sound construction of the constitution require that these valuations should be made by jury?

We all revere the constitution, and profess to be regulated by its provisions. We believe it to be the supreme law of the land, and "paramount to the power of the legislature;" and that, whenever the legislature undertakes, in the exercise of its authority, to transcend the limits clearly prescribed to it by the constitution, its acts are void. It is, nevertheless, our duty to give it a rational and just interpretation; avoiding, on the one hand, a spirit of slavish fear, and on the other, a spirit of restless innovation. The constitution provides, that the common law of England, as well as so much of the statute law, as have heretofore been practised in this state, shall remain in force until altered, &c.; and that the inestimable right of trial by jury shall remain confirmed as a part of the law of this state, without repeal, for ever.

It is unnecessary to inquire into the origin of the trial by jury, or how far, and to what particular cases, it has been extended in England. How it was exercised in the colony, at the time of adopting the constitution, is a more important inquiry. It was a part of the common law, so far as that had been adopted or acted on here at that time; so far it was to remain the law of the state, until altered; but that part of it relating to trial by jury was to remain without repeal. It was to remain, as it had theretofore been in use. Our means of information as to the practice in cases like the present, before and at the time the constitution was adopted, are limited. They are sufficient, however, to satisfy us, that the writ of *ad quod damnum* was not in use universally. In *Smith's History of New-Jersey*, we find that in 1681, under the proprietary government, certain commissioners for the settling and regulating of lands in this province, ordained, that in laying out, or *setting forth* as it is termed in the regulations, all public highways, the owners of lands, when such public highways shall be laid forth, shall be allowed reasonable satisfaction in lieu thereof, *at the discretion of the commission-*

*ers.* By looking a little further into this matter, it appears, that these commissioners for regulating lands, &c. were appointed by the first provincial assembly of West Jersey, assembled at Burlington in 1681: *Leaming and Spicer*, 440. And it is remarkable, that the assembly at the same session passed a solemn act, general and fundamental in its character, and in many respects corresponding with a bill of rights, in which they declare, " that no proprietor, freeholder, or inhabitant of the province, shall be deprived or condemned of life, limb, liberty, estate, property, or any ways hurt in his or their privileges, freedoms, or franchises, upon any account whatsoever, without a due *tryal* and judgment, passed by *twelve good and lawful men of the neighborhood, first had, or according to the laws of England."* Either the ordinance of the commissioners for regulating lands, acting under the authority of this very assembly, and some of whom were members of it, was irregular and unlawful, or the valuation thus to be made for private property taken for public use, was not considered a case in which a jury was indispensably necessary according to the laws of England. The latter branch of the proposition is by far the more probable, and if it be correct it proves satisfactorily that they did not apply the common law right of trial by jury to a case of that kind. In 1765, under the royal government, provision was made by law for the assessment of damages by commissioners, on the occasion of laying out *certain straight roads* in the province : *Allison*, 273. Before this time, there was a general road law, by which private property was taken and appropriated as it now is, without compensation, and which had reference only to the ordinary roads from one neighborhood or settlement to another. It was supposed by the legislature that it would greatly facilitate the conveyance of letters by the post, be of great importance to his majesty's service, and to the commercial interests and general convenience of the inhabitants of the province, to have some of the principal highways shortened. Commissioners to make the necessary surveys and estimates were appointed, with power to enter and pass any lands through which the straight lines might run. They were directed to make an estimate of the whole expense, and also of the damages it might occasion to any person

July, 1832.

Scudder
v.
Trenton Delaware Falls
Co.

through whose lands it might pass, and a provision was made for paying the whole expense by lottery. It would appear from this, that the legislature thought these communications, when thus opened, would be more immediately important to the public at large, and especially to the government; and that in taking private property for these purposes, there was a propriety and moral fitness in making compensation to the owners. Commissioners, as we have seen, were appointed to make an assessment of the damages to be sustained by individuals. These cases are important to show what was the practice before the revolution; and if, in consequence of the payment of damages, the property of the soil became vested in the state, as I apprehend was the fact in the last case, it is directly in point. That the property was absolutely divested, and became the property of the state, is inferred from the fact that these particular roads, have been, in all our road laws save the last, excepted out of their general operation, and declared to be unalterable by surveyors of the highways, or any other persons. I do not find any cases about this time, in which the writ of *ad quod damnum* was resorted to, or an assessment by jury ordered; and, judging from what I have been able to find, I cannot come to the conclusion that in 1776, when the constitution was adopted, the trial by jury was extended to this kind of assessments, and that it was, therefore, the common law of the land. It may be useful to inquire, what has been the practice since. In 1791, the act was passed incorporating the society for useful manufactures at Paterson. This act was prepared with great care and particularity, and provides for an assessment by the writ of *ad quod damnum* and a jury. The most of the acts passed since that period, in which private property is authorized to be taken for public use, are acts authorizing the making of turnpike roads or canals; and they have almost uniformly, till of late, followed that precedent, so far as regards the taking of lands to be permanently occupied. There are some acts in which a different mode has been pursued. In 1802, the legislature authorized Nathaniel Budd to appropriate to his own use, for the purposes of a ferry at Paulus Hook, two acres of land which was in dispute between the heirs of Kennedy and the corporation of Bergen. The act provided, that if, after the contro-

versy was ended, the successful party and the said Budd could not agree as to the value of the land, or the sum to be paid by Budd, that then he should pay such sum annually by way of ground rent, as should be adjudged by three disinterested free-holders, appointed by one of the justices of the supreme court; or that Budd should be paid for his improvements an amount to be ascertained in the same way : 1 *Pamph. Laws*, 153. See also 2 *Pamph. Laws*, 747, as to the mode of making assessment in relation to the drowned lands in Sussex. In 1798, it was enacted, that all those who should receive damage by the erection of a bridge over the river Delaware at Trenton, should be compensated in damages, and the damages assessed by commissioners to be appointed by some of the justices of the supreme court.

So far as relates to the damages sustained by taking away gravel, stones, or other materials for constructing roads, canals and other improvements, most of the charters have left them to be ascertained by arbitrators or commissioners. And yet it is evident, that in many instances, the taking away of such materials, and appropriating them to the use of a company, is quite as injurious as appropriating the whole land. If it be gravel, the value of the property may be destroyed when that is gone. If it be a quarry, of what benefit will the property be when the stone is exhausted? The principle is the same, whether the entire possession of the land be taken, or whether the possession be assumed of one half of it. It is not easy to perceive why a different course of proceeding has been adopted in the two cases, if both were within the range of *constitutional* provision ; and if one is, will it be said that both are not.

It is, nevertheless, certainly true, that since the year 1800, almost all the acts passed have provided for assessments by a jury where lands have been taken absolutely. This shows the strength of popular feeling in favor of that mode, rather than its exclusive constitutionality. It may be a strong argument with the legislature in favor of the policy of providing that mode, as most satisfactory, and most analagous to the genius of our institutions ; but does not satisfy me that the mode adopted in the act under consideration is unconstitutional, and therefore void. The

evidence in favor of the practice, before the adoption of the constitution, is very strong; and I am, moreover, strongly inclined to the opinion, that the words of the constitution are fully satisfied by preserving the trial by jury in all criminal cases, and all trials of right in suits at common law.

I conclude, then, that the first objection against the constitutionality of the present act, is not sustained.

The second objection is, that the land is sought to be taken, not to answer any state necessity, nor for the benefit of the community at large, nor for any public use whatever, but solely for the private gain and emolument of the company.

This presents a grave and interesting subject for inquiry. It strikes at the constitutionality of the law, not merely in relation to its details, and minor provisions, but its very nature and objects; and if the blow be well aimed, it is utter destruction.

It is admitted, that private property shall not be taken for private use. The legislature has no right to take the property of one man and give it to another, even upon compensation being made. I have already adverted to the right of the state to take private property for public use, and need not repeat what has been said. This right was originally founded on *state necessity*. If its exercise had been confined to this limit, there could be no doubt as to this case; for it will not be pretended that the enjoyment of the complainant's property is called for by any necessity of the state, or that it is to be appropriated in that way. In process of time the right has been more liberally construed. The term *public use*, has been substituted; and what shall be considered as public use, is, under the decisions of our courts, an unsettled question. It is not limited to the actual use and occupation of the property by the state; for private property is taken in many instances, when the state, in its sovereign capacity, does not and cannot occupy it. It is not limited to public political corporations; for the right of private corporations, to take private property for a variety of purposes, such as the construction of canals, turnpike roads, &c., is not disputed at this day. Nor is it limited to private corporations whose sole object, or even whose primary object it is, to promote the public good. Such corporations are not to be found. Private interest or emolument, is the

July, 1832.

Scudder
v.
Trenton Del-
aware Falls
Co.

*primum mobile* in all. The public interest is secondary and consequential. Where, then, shall the line be drawn by this court, called on as it now is to decide on the point ?

Before I undertake to express any opinion, it will be well to see that I am in the line of duty; for it is contended on the part of the defendants, that the power of judging on this subject is committed to the legislative department of the government alone, and that the judiciary cannot interfere. This doctrine the court can in no wise admit. The legislature, in this state, is not omnipotent, as was the British parliament. It is subordinate to the constitution; and if it transcend its power, its acts are void, and it is the duty of the judiciary to declare them so. The duty is at all times unpleasant, but no independent tribunal will hesitate to do it in clear cases. The opinion of chancellor Kent, in his Commentaries, (2 *Kent*, 276,) does not support the position of the learned counsel. The author remarks, that it undoubtedly must rest in the wisdom of the legislature to determine when public use requires the assumption of private property. I do not understand by this, that the legislature is to be sole judge of what is meant by public use; but that the fact being established, that private property of a particular character may be taken and appropriated to public purposes, it is for the wisdom of the legislature to say when that appropriation shall be made. That the commentator did not intend to be understood as saying, that the legislature was to be sole judge in this case, is evident; for he admits afterwards, that if the legislature should take the property of A. and give it to B., the law would be unconstitutional and void. And yet who is to judge that the property thus taken from one and given to another, was not intended by the legislature for public use or benefit? Who is to declare it unconstitutional and void, after they have determined its propriety?

Not doubting that the court may safely sit in judgment on this matter, it only remains to inquire, whether the use to which the property is to be appropriated, is a public use. It has been seen, that turnpike roads and canals are considered of a public nature, so far as to authorize the taking of private property for their construction. Railroads have lately been added to this class of public improvements. In the case of *Joseph Buonaparte* v. *The*

*Camden and Amboy Railroad and Transportation compa
ny,* the circuit court refused to grant an injunction, applied for
on the ground that the purpose to which the land was to be ap-
plied was a private and not a public purpose. The same course
was taken by chancellor Walworth, in the case of *Beekman* v.
*The Saratoga and Schenectady Railroad company.* It is
contended, however, that the present case is going a step further
than has yet been done. Turnpike roads have been considered
as public, or as appropriated to public uses, because every one
has a right to travel them on paying the regular toll. Railroads
have been considered public, because they facilitate the convey-
ance of passengers and the transportation of merchandize, and
thereby benefit the community : whereas the object of the present
franchise is to create a water power, and erect thereon extensive
manufacturing establishments. These will be under the control
of individuals. The company may either build or lease. They
may build for themselves, or lease to whom they please. And
they are under no obligation to let the public participate in the
immediate profits of their undertaking. If to establish this as a
public benefit, it be indispensably necessary that the public
should have the privilege of participating in it directly and im-
mediately, then the proposition is not made out, and the defen-
dants have no authority. But is not this view too narrow ? Can
public improvements be limited within such a compass ? May
we not, in considering what shall be deemed a public use and
benefit, look at the objects, the purposes, and the results of the
undertaking ? The water power about to be created, will be
sufficient for the erection of seventy mills, and factories, and
other works dependent on such power. It will be located at the
seat of government, at the head of tide water, and in a flourish-
ing and populous district of country. It will be no experiment
in a country like ours ; and, judging from the results in other
places, we may make a sufficiently accurate calculation as to the
result here. Take the town of Paterson as an example. The
water power there is in the hands of individuals—a company
like this. They are under no obligation to lease or sell any
mills or privileges to the public; and yet see the result of a few
years' operation. Paterson is now the manufacturing emporium

of the state, with a population of eight thousand souls. It has increased the value of property in all that district of country ; opened a market for the produce of the soil, and given a stimulus to industry of every kind. May we not hope that a similar benefit may be experienced here ? Compare this with some other improvements in the state, which, on the principles contended for, are called improvements for public purposes, and for the erection of which a large amount of private property has been taken. Take, for example, one of the oldest and longest turnpike roads in the state—the one from New-Brunswick to Easton. What public benefit has resulted from that road, compared with the result of the water power on the Passaic ? And yet, the road is declared constitutional, because the community may use it by paying toll.

I incline to think the principle sought to be established by the defendants' counsel, is too limited ; but I do not know that this court can establish a general rule that shall hold good in all cases, and be a permanent bar to legislative encroachment. The ever varying condition of society is constantly presenting new objects of public importance and utility ; and what shall be considered a public use or benefit, may depend somewhat on the situation and wants of the community for the time being. The great principle remains. There must be a public use or benefit ; that is indisputable : but what that shall consist of, or how extensive it shall be to authorize an appropriation of private property, is not easily reducible to general rule.

Looking at this case in all its bearings, and believing as I do that great benefit will result to the community from the contemplated improvement, I am not satisfied to declare the act of incorporation, or that part of it which is now in question, void and unconstitutional. I do not see in it such a decided and palpable violation of constitutional right as will warrant me to put an end to this work, by the strong arm of the court. The legislature have thought proper, in their wisdom, to exercise the right of eminent domain, for an object which they deem of public use and importance ; and although their judgment is not conclusive as to the right, it is certainly entitled to a most respectful consideration. They have authorized a company to do what the state itself

92

might have done without having their right questioned. They have in this pursued the ordinary mode. All great improvements in our state, are made through private incorporated companies, and perhaps better accomplished in that way than any other. The mere mode of making them, forms no objection in itself to their constitutionality : courts will look at the object, and judge from that.

In passing upon this question, I cannot forget that I am sitting in equity, where questions of strict law are not ordinarily tried ; and that the court is called on to exercise a most high and delicate power, one never to be exercised except in clear and unequivocal cases. This does not present itself to me as such case ; and although in the investigation of it, I have entertained serious doubts on the last point, yet I am clearly of opinion that the injunction ought not to issue.

The injunction is refused.